## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 04 2019, 8:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT S.E.

Cara Schaefer Wieneke
Brooklyn, Indiana


ATTORNEY FOR APPELLANT R.M.

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of B.E. and A.M. (Minor Children) | December 4, 2019 |
| and | Court of Appeals Case No. 19A-JT-1370 |
| S.E. (Mother) | Appeal from the Vigo Circuit Court |
| and | The Honorable Sarah K. Mullican, Judge |
| R.M. (Father), | The Honorable Daniel W. Kelly, Magistrate |
| *Appellants-Respondents,* | Trial Court Cause Nos. |
| v. | 84C01-1811-JT-1266 |
| | 84C01-1811-JT-1267 |

The Indiana Department of
Child Services,

*Appellee-Petitioner*.

**Bailey, Judge.**

# Case Summary

S.E. ("Mother") and R.M. ("Father") challenge the trial court's order terminating their parental rights to their child, A.M. ("Child), born September 20, 2012. Mother also challenges the order terminating her parental rights to her other child, B.E., born January 31, 2007.[1]

We affirm in part and reverse in part.

# Issues

We consolidate and restate the dispositive issues on appeal as follows:

> 1. Whether the order terminating Father's parental rights should be reversed as void for lack of personal jurisdiction because the Indiana Department of Child Services

---

[1] B.E.'s Father, R.H., does not participate in this appeal.

("DCS") did not file a return showing proof of service of process.

2.      Whether the trial court clearly erred when it terminated Mother's parental rights to A.M. and B.E. (collectively "Children").

# Facts and Procedural History

[4]    On July 29, 2016, DCS filed Child in Need of Services ("CHINS") petitions in which it alleged that Children, who lived with Mother, were CHINS due to Mother's drug use. On December 30, 2016,[2] the trial court adjudicated Children to be CHINS.[3] On January 4, 2017, DCS removed Children from Mother's home due to Mother's refusal to submit to drug screens and her "violent or out of control" behavior. Ex. Vol. I at 147-48. The trial court issued a dispositional decree on January 20, 2017, in which it ordered Mother to comply with services, including drug screens.

[5]    Prior to Child's removal, Father had called DCS three times; however, after removal, DCS was not able to locate Father. At some point during the pendency of the CHINS case, DCS made "[a]n investigator referral" to locate Father. Ex. Vol. II at 74, 96. Father "was located at his parents' address where

---

[2] In its May 15, 2019, Termination of Parental Rights ("TPR") Order, the trial court stated that Children were adjudicated CHINS on December 16, 2016. However, that is the date the magistrate recommended a CHINS adjudication. The judge approved that recommendation on December 30. Ex. Vol. I at 10, 53.

[3] Mother appealed the CHINS adjudication, which we affirmed in a memorandum decision. *S.E. v. Ind. Dep't of Child Serv.*, No. 84A01-1702-JC-358, 2017 WL 3298585 (Ind. Ct. App. Aug. 3, 2017).

he said he receives his mail but does not live." *Id.* The address where Father lived was "unknown" to DCS. *Id.*

[6] DCS filed petitions to terminate Mother's and Father's parental rights on November 1, 2018. On February 20, 2019, DCS filed a Praecipe for Summons by Publication, in which it sought authorization to notify Father of the TPR action by publication. It attached to the praecipe an "Affidavit of Diligent Inquiry" in which DCS Family Case Manager ("FCM") Megan Watson affirmed that she had made "a diligent search" for Father, but he could not "be found, ha[d] concealed [his] whereabouts, or ha[d] left the state." Appellant's Supp. App. Vol. II at 4. FCM Watson further affirmed that she had attempted to serve Father at his last known address, but service was "returned undeliverable." *Id.* FCM Watson affirmed that her search for Father included checking: the Management Gateway for Indiana Kids database; the Indiana Client Eligibility System database; the county jail; the Indiana Department of Correction Offender database; the Federal Bureau of Prisons, Federal Inmate Locator database; http://accurint.com; and Doxpop. *Id.* In an order dated February 21, the trial court granted the motion to serve Father with notice of the TPR action and TPR hearing date of May 14, 2019, by publication.

[7] The trial court conducted hearings on the termination of Mother's parental rights on February 25 and April 2, and Father did not appear at those hearings. On April 29, DCS filed a Notice of Publication on Father which had no attachments and which stated, in full: "Comes now DCS and notifies the Court of service by publication as to the Father." *Id.* at 8. On May 14, 2019, the

court conducted a hearing on the petition to terminate Father's parental rights at which Father did not appear.

[8] On May 15, 2019, the juvenile court entered an Order of Termination of Parental Rights terminating the parental rights of Mother and Father as to Child. That same date the court entered an additional order terminating Mother's parental rights as to B.E. The termination orders[4] stated, in relevant part:

> 2. It was established by clear and convincing evidence that the allegations in the petition are true in that:
>
> ***
>
> e. There is a reasonable probability that the conditions which resulted in the removal of the child from his parents will not be remedied or the reasons for placement outside of the home of the parents will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of the child as follows:
>
> > 1. On or about May 19, 2016, DCS received a report that [A.M.]'s[5] mother, [S.E.], had been at home with her son, [A.M.], and that there was a strong smell of marijuana and suspected methamphetamine use in the home. On May 20,

---

[4] The relevant portions of the TPR orders regarding A.M. and B.E. are identical except where specifically noted.

[5] The TPR order regarding B.E. states "[B.E.]'s" in place of "[A.M.]'s." Appellants' Amended Joint App. Vol. II at 69.

2016, FCM Eldred went to the home, where [Mother] initially denied, but later admitted, to methamphetamine use, and tested positive for methamphetamine on that day. Following that screen, [Mother] agreed to screen on Mondays, Wednesdays and Fridays during the DCS assessment to ensure her sobriety. [Mother] missed some of these screens and on June 24, 2016, again tested positive for methamphetamine at a high level. Consequently, the Department opened an In-Home CHINS case on July 29, 2016.

2. [A.M.][6] had previously been adjudicated a CHINS and was previously removed from his mother's care under Cause No. 84001-141 1-JC—1255, which was open from November 20, 2014, to April 21, 2015.

3. There have been CHINS proceedings involving [A.M.][7] for all or parts of 2014, 2015, 2016, 2017, 2018 and 2019.

4. Pursuant to the dispositional decree of January 20, 2017, [Mother] was ordered into home-based case management, to submit to a substance use assessment and to follow the recommendations thereof, to attend parenting classes and to submit to drug screens.

5. At the beginning of the case, [Mother] refused to allow the FCM to see her children, [B.E.] and

---

[6] The TPR order regarding B.E. states "[B.E.]" in place of "[A.M.]." *Id.*

[7] The TPR order regarding B.E. states "[B.E.]" in place of "[A.M.]." *Id.*

[A.M.],[8] cancelled meetings related to her CHINS case and services, refused drug screens and refused to participate in court-ordered services, including substance abuse treatment.

6. DCS, CASA and [A.M.] have had no contact with [A.M.]'s biological father, [R.M.], from the beginning of this case to the present.[9]

7. When Mother came to [the] DCS office on August 16, 2016, [A.M.]'s brother,[10] [B.E.], was standing in the backseat with no car seat in the car and [Mother] refused to discuss the matter with the FCM.

8. In September 2016, when [A.M.]'s brother,[11] [B.E.], said he lacked clothes, DCS got him a clothing voucher for the Goodwill; however, they could not get Mother to talk to them. A few days later, Mother informed DCS that her power was going to get shut off and it was.

9. In October 2016, the kids' beds had no mattresses and the boards on the bunk beds were broken.

---

[8] The TPR order regarding B.E. contains the words "his brother," before "[A.M.]." *Id.* at 70.

[9] Provision 2(e)(6) of the TPR Order regarding B.E. states as follows: "The FCM met with [R.H.], [B.E.]'s father, twice in mid-August, 2016. That same month, after asking DCS to pay her electric bill, Mother refused to allow DCS to see her children." *Id.*

[10] The TPR order regarding B.E. does not contain the words "[A.M.]'s brother," before "[B.E.]." *Id.*

[11] The TPR order regarding B.E. does not contain the words "[A.M.]'s brother," before "[B.E.]." *Id.*

10. In November 2016, [B.E.] was missing school. He had a cracked rib and Mother refused to discuss the situation with DCS.

11. On December 27, 2016, DCS discovered blood throughout the boyfriend's home and bloody footprints tracked throughout. The boys were in the home and were able to see this as well.

12. At about this time, DCS received a new report that the kids were being left with various caregivers that were abusing [B.E.]. DCS witnessed Mother verbally abusing him and Mother threw a drug screen at the FCM and tried to throw a chair. The children were removed on or about January 4, 2017.

13. A Substance Use Assessment completed on January 10, 2017, recommended that Mother undergo dual diagnosis counseling. She began that counseling, but never completed it.

14. Redwood Toxicology closed [Mother] out of services three times for failing to complete court-ordered screens. She tested positive for methamphetamine and amphetamine on January 6, 2017, August 11, 2017, and several more times before FCM Abigail Tracy transferred the case in December 2017. Her baby, [T.], was born in November 2017, even though [Mother] was testing positive for meth[amphetamine] in August and September of that year.

15. After some progress on the case in the spring of 2017, Mother's refusal to assist in cleaning the home of her grandmother resulted in her being

asked to leave that home. She stayed in her car for a while and otherwise experienced housing instability.

16. [Mother] was unable to keep a job for longer than a couple of weeks at a time.

17. Most of [Mother]'s screens were positive for some substance, typically marijuana and/or methamphetamine, including at least two meth[amphetamine] positive screens in 2019.

18. In March of 2018, [Mother] went into the Eagle Street dual diagnosis sober living environment. She tested positive for meth[amphetamine] upon her admission, wasn't getting along with the other women in the home, and when she tested positive for meth[amphetamine] on May 1, 2018, she was asked to leave the home. During her five weeks in the home, she had write-ups for receiving unapproved visitors, refusing drug screens, testing positive and verbally abusing staff.

19. [Mother]'s case manager from Hamilton Center worked with her on housing, employment and coping skills; however, this was unsuccessful as [Mother] failed to keep her appointments with the home-based case manager. When the case manager supervised her visits with her children, she showed some improvement in her ability to manage all three kids at once but continued to talk to the children about subjects that were not deemed appropriate and had to be reminded about that.

20.    [Mother] had an apartment for one month in 2018 which her boyfriend trashed. She wasn't paying the bills and was evicted. [Mother] had an extremely toxic relationship with her boyfriend, Donnie, which has continued off and on to the time of the termination hearings.

21.    In addition to her serious and long-standing substance abuse problem, [Mother] has an extremely explosive temper, which also has not been successfully dealt with after years of DCS involvement and services. She has also been diagnosed as bipolar, but the physician refused to prescribe medication so long as she continued to use meth[amphetamine].

22.    [Mother] was again recommended for a dual diagnosis group in November of 2018. She failed to attend her last two appointments.

23.    FCM Megan Watson became the permanency family case manager in November 2018. She was unable to get [Mother] to provide two weeks of clean screens. She observed [Mother] to appear to be under the influence of drugs at visits and to have difficulty focusing on the children. Her current boyfriend is an alcoholic with an open DCS case in Clay County.

24.    [Mother] has been arrested six times while her children have been in care during these CHINS proceedings: (1) 84H01-1807-CM-1244 (Resisting Law Enforcement and Criminal Trespass with a Vehicle); 84DO1-1807-F6-2409 (Auto Theft, Possession of Marijuana); 84H01-1810-CM-1902

(Driving While Suspended, Operating without Proof of Financial Responsibility and violation of open container law); 84HO1-1901-CM-18 (Criminal Conversion); 84HO1-1901-CM-56 (Criminal Mischief); and 84D01-1902-F6-661 (Forgery and Fraud).

      25.    [A.M.]'s biological father, [R.M.], has had no contact with [A.M.], DCS or CASA since the inception of this case nearly three years ago.[12]

    f.    Termination is in the best interests of the minor child as testified to by DCS and CASA.

    g.    The Department of Child Services has a satisfactory plan for the care and treatment of the child, which is adoption.

3.    Accordingly, the Court finds that the parent-child relationship between [A.M.] (D.O.B. 9-20-2012) and his natural father, [R.M.],[13] and natural mother, [S.E.], is hereby terminated and all rights, powers, privileges, immunities, duties and obligations, including the right to consent to adoption, pertaining to that relationship [are] permanently terminated. The child shall remain as a ward of the DCS pending finalization of an adoption.

---

[12] Provision 2(e)(25) of the TPR Order regarding B.E. states as follows: "[B.E.]'s biological father, [R.H.], has had very limited contact with DCS since the CHINS case was opened nearly three years ago and has had no contact with [B.E.]. He screened a single time for DCS and tested positive for meth[amphetamine]." Appellants' Amended Joint App. Vol. II at 72.

[13] Provision 3 of the TPR order regarding B.E. substitutes B.E.'s name and date of birth for that of A.M. and "[R.H.]" for "[R.M.]." *Id.* at 72.

Appellants' Amended Joint App. Vol. II at 115-19.

Father and Mother now appeal the TPR orders.

# Discussion and Decision

## Personal Jurisdiction

Father contends that the TPR order as to him is void for lack of personal jurisdiction because DCS never properly served him as required by the Indiana Trial Rules and due process.

> "The existence of personal jurisdiction over a defendant is a question of law and a constitutional requirement to rendering a valid judgment[.] ... Thus, we review a trial court's determination regarding personal jurisdiction de novo." *Munster v. Groce*, 829 N.E.2d 52, 57 (Ind. Ct. App. 2005). Although we do not defer to the trial court's legal conclusion as to its existence, personal jurisdiction turns on facts; accordingly, findings of fact by the trial court are reviewed for clear error. *Grabowski v. Waters*, 901 N.E.2d 560, 563 (Ind. Ct. App. 2009), *trans. denied*. Clear error exists where the record does not offer facts or inferences to support the trial court's findings or conclusions of law. *Id*.
>
> The question as to whether process was sufficient to permit a trial court to exercise jurisdiction over a party involves two inquiries: whether there was compliance with the Indiana Trial Rules regarding service, and whether the attempts at service comported with the Due Process Clause of the Fourteenth Amendment. *Id*. It is commonly understood that procedural due process includes notice and an opportunity to be heard. *Trigg v. Al–Khazali*, 881 N.E.2d 699, 702 (Ind. Ct. App. 2008), *reh'g denied*.

*D.L.D. v. L.D.*, 911 N.E.2d 675, 679 (Ind. Ct. App. 2009), *trans. denied*; *see also Grabowski*, 901 N.E.2d at 563 (noting ineffective service of process prohibits a trial court from having personal jurisdiction over a defendant, and any judgment issued in such a case is void and a nullity).

[11] Indiana Trial Rule 4.9 allows service to be made by publication in accordance with Trial Rule 4.13. Under the latter rule, the party seeking notice by publication "shall submit his request therefor upon the praecipe for summons along with supporting affidavits that diligent search has been made [and] that the defendant cannot be found, has concealed his whereabouts, or has left the state, and shall prepare the contents of the summons to be published." T.R. 4.13(A). If the court grants that request, the summons shall be published in accordance with the procedures outlined in the rule, including the requirement that the person making service "shall" prepare a return and supporting affidavits and file them with the pleadings. T.R. 4.13(C) and (E); *see also* T.R. 4.15(A) ("The person making service shall promptly make his return upon or attach it to a copy of the summons which shall be delivered to the clerk."); T.R. 4.15(B) ("The return … shall be filed by the clerk with the other pleadings."). The return must be signed by the person making it, and must include a statement:

> (1) that service was made upon the person as required by law and the time, place, and manner thereof;
>
> (2) if service was not made, the particular manner in which it was thwarted in terms of fact or in terms of law;

(3) such other information as is expressly required by these rules.

T.R. 4.15(A). After it is filed, the return becomes a part of the record and "shall constitute evidence of proper service." T.R. 4.15(C).

[12] Here, DCS filed a praecipe for service by publication and attached an affidavit in which it represented that DCS had made a diligent search for Father but he "[could] not be found, has concealed whereabouts, or has left the state."[14] Appellants' Supp. App. Vol. II at 4. The trial court granted the request to serve Father by publication and issued a "Summons for Service by Publication & Notice of Termination of Parental Rights Hearing." *Id.* at 7. However, DCS never filed a return with proof of service by publication as required by Trial Rules 4.13(E) and 4.15(A).[15] Because there is no return demonstrating that the summons for service by publication was published, service upon Father was defective under the Trial Rules and the requirements of due process. *See, e.g.,* *Matter of Adoption of M.A.S.*, 695 N.E.2d 1037, 1040 (Ind. Ct. App. 1998)

---

[14] Contrary to Father's assertion, the Affidavit complied with the trial rule that DCS make a "diligent search" for Father before seeking service by publication. DCS served Father at his last known address and searched for him in seven different locations and/or databases. *Cf., e.g.,* *Yoder v. Colonial Nat. Mortg.*, 920 N.E.2d 798, 802-03 (Ind. Ct. App. 2010) (holding search was not diligent where plaintiff only used an internet "people-search tool" to do a "cursory" search for defendant).

[15] DCS maintains that there is sufficient other evidence in the record to show Father received adequate service of process. We disagree. For support, DCS points only to a brief exchange between the court and DCS counsel at the May 2019 TPR hearing at which the court indicated that the court file contained the April 29, 2019, "proof of publication." May Tr. at 5. However, the trial court did not state that there was a return of service in the case file and DCS admits that no such return existed. The April 29 "proof of publication" to which the court referred had no attachments and stated only: "Comes now DCS and notifies the Court of service by publication as to the Father." Appellant's Supp. App. Vol. II at 8. That document, alone, is not sufficient proof of service as required by the Trial Rules. *See* T.R. 4.13; T.R. 4.15.

(holding service was defective where there was no indication on the return that Respondent had received the summons); *Munster*, 829 N.E.2d at 58 (noting the due process "'right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.'" (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Since service of process was defective, the trial court did not acquire personal jurisdiction over Father and the TPR order as to Father is void.[16] *Grabowski*, 901 N.E.2d at 563.

[13] DCS points to Trial Rule 4.15(F), which states that a defective summons or service thereof shall not be set aside or adjudged insufficient if it is reasonably calculated to inform the person to be served of the action and relevant information. However, the "savings provision" contained in Rule 4.15(F) "is meant to excuse minor, technical defects in the method of service where actual service has been accomplished." *Cotton v. Cotton*, 942 N.E.2d 161,166 (Ind. Ct. App. 2011) (quotation and citation omitted). Trial Rule 4.15(F) "does not cure service of process when there has been no service on a party." *Overhauser v. Fowler*, 549 N.E.2d 71, 73 (Ind. Ct. App. 1990) (quotation and citation omitted); *see also LaPalme v. Romero*, 621 N.E.2d 1102, 1106 (Ind. 1993) (noting Rule 4.15(F) only cures technical defects in service of process, "not the total failure to serve process"). Thus, in *Cotton*, for example, we held that a defect in

---

[16] Given this holding, there is no need for us to address Father's additional claim that DCS failed to comply with the statutory requirement that it provide notice of a TPR hearing at least ten days prior to the date of that hearing. Ind. Code § 31-35-2-6.5.

the summons was not "minor" and therefore excusable under Rule 4.15(F) where it failed to inform the respondent of the possibility of default judgment if she failed to appear at a hearing. *Cotton*, 942 N.E.2d at 166.

[14] Here, there is no return proving service upon Father, Father contends he did not receive service, and Father never appeared before the trial court in the termination action. DCS's complete failure to provide proof of service is not a "minor defect" that can be cured by Trial Rule 4.15(F).[17]

## Termination of Mother's Parental Rights

*Standard of Review*

[15] Mother asserts that the trial court's order terminating her parental rights to Children was clearly erroneous. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty.*

---

[17] Nor did DCS "amend" proof of service of process as permitted by Trial Rule 4.15(E) when, on August 29, 2019, it attempted to file in the trial court a return allegedly showing proof of service. As we stated in our November 6, 2019, Order in this appeal, the trial court did not have jurisdiction to accept the return DCS attempted to file on August 29 because the Notice of Completion of Clerk's Record already had been noted in the trial court's Chronological Case Summary ("CCS"). *See* Ind. Appellate Rule 8 (stating appellate court acquires jurisdiction on the date the Notice of Completion of Clerk's Record is noted in the CCS). Therefore, the document DCS attempted to file on August 29 is not part of the record.

*Office of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[16] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

(A) that one (1) of the following is true:

\* \* \*

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions,
been adjudicated a child in need of services.

\* \* \*

(C) [and] that termination is in the best interests of the child . . . .

I.C. § 31-35-2-4(b)(2). DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights. *Id.* DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[17] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Office of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Office of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[18] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of

review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[19] Mother does not specifically challenge any of the trial court's relevant findings of fact. Rather, she contends that the trial court erred in its conclusions of law. Specifically, she alleges that the trial court erred in concluding that she will not remedy the conditions that resulted in Children's removal and that the continuation of the parent-child relationship poses a threat to the well-being of Children. She also challenges the trial court's finding that termination is in the best interests of Children. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we only address whether the trial court erred in concluding that Mother will not remedy the conditions that resulted in Children's removal and that termination is in Children's best interest. We also address Mother's contention that DCS failed to present a satisfactory permanency plan for Children.

*Conditions that Resulted in Children's Removal*

[20] Mother maintains that the trial court erred in concluding there was a reasonable probability that the conditions that resulted in Children's removal will not be

remedied. In support, she points to evidence of her very recent compliance with some of the court's requirements, such as engaging in drug treatment classes and attending Narcotics Anonymous meetings. However, her arguments on appeal are simply requests that we reweigh the evidence, which we will not do. *See In re D.D.*, 804 N.E.2d at 265. Instead, we must determine whether the evidence most favorable to the judgment supports the trial court's conclusion. *Id.*; *Quillen*, 671 N.E.2d at 102.

[21] In determining whether the evidence supports the trial court's conclusion that Mother was unlikely to remedy the reasons for removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the second step, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *Id.* However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not

required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[22] Children were initially removed from Mother's care due to her drug use and erratic behavior. And, although she maintained at the April 2019 hearing that she was "staying sober,"[18] the evidence establishes that Mother tested positive for illegal drugs throughout the course of the CHINS and TPR proceedings and as recently as February 2019. April Tr. at 45. Additionally, there was evidence that Mother had failed throughout the proceedings to participate in or complete drug screens and treatment for her drug abuse and mental health issues. Although Mother completed participation in one women's group for substance abuse, she continued to test positive for illegal drug use afterwards. At the time of the termination hearing, Mother was not taking some of the medications prescribed to treat her mental health problems because they had been stolen when she was in jail. She had also failed to consistently participate in court-ordered case management services and maintain employment and housing. And she continued to periodically behave violently; for example, she screamed, became "combative," and "punched things" at team meetings with DCS. Feb. Tr. at 41. During the course of the proceedings and as recently as the April

---

[18] Contrary to Mother's assertion in her brief, Mother did not testify at the April 2019 TPR hearing that "she was actively engaged in intense inpatient addictions treatment." Mother's Br. at 12. Rather, Mother testified that she was unable to obtain inpatient treatment, but she was attending NA meetings and would be starting "MRT" and "true thoughts" classes through "Club Soda" starting the following Friday. April Tr. at 44-45. Mother did not define "MRT" or "true thoughts" classes, nor did she state what kind of program "Club Soda" is other than it is one that lasts ninety days. *Id.* at 47. Mother testified that she went to Club Soda on her own initiative in March of 2019. *Id.*

2019 termination hearing, Mother had been charged with various crimes and was incarcerated following numerous arrests. At the time of the termination hearing, Mother had pending probation violation allegations against her. Given Mother's habitual and continued patterns of drug use and her failure to participate in and/or complete court-ordered services such as drug and mental health treatment, we cannot say the trial court erred in concluding that the conditions at the time of Children's removal were not, and likely will not be, remedied.

*Best Interests*

[23] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs.* (*In re A.K.*), 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d at 224. Such evidence, "in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that

termination is in the child's best interests." *L.S. v. Ind. Dep't of Child Servs.* (*In re A.D.S.*), 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*.

[24] Again, Mother's contentions on this issue amount to requests that we reweigh the evidence, which we will not do. The evidence most favorable to the judgment shows that, throughout the CHINS and TPR proceedings, Mother failed to participate in and/or complete drug treatment and mental health treatment as required, failed to provide consistently clean drug screens, failed to obtain and keep employment or stable housing, failed to consistently control her violent behavior, and was in and out of jail due to multiple criminal charges against her. At the time of the termination hearing, the only drug treatment program Mother had completed was a women's group program, after which she again tested positive for drug use, and she had pending probation violation allegations against her. Furthermore, both the FCM and the Court Appointed Special Advocate testified that they believed termination of Mother's parental rights was in Children's best interests. Given that testimony, in addition to evidence that the children need permanency and stability that Mother cannot provide and that the reasons for the children's removal from Mother will not likely be remedied, we hold that the totality of the evidence supports the trial court's conclusion that termination is in Children's best interests. *In re A.D.S.*, 987 N.E.2d at 1158-59. The trial court did not clearly err when it terminated Mother's parental rights to Children.

[25] Mother maintains that DCS failed to show that it had a satisfactory permanency plan for Children. We disagree. A permanency plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re D.D.*, 804 N.E.2d at 268 (citing *Jones v. Gibson Cty. Div. of Family and Children (In re B.D.J.)*, 728 N.E.2d 195, 204 (Ind. Ct. App. 2000)). DCS presented a plan for adoption of Children, including potential placement of Children together. Adoption is a satisfactory plan for permanency. *K.W. v. Ind. Dep't of Child Servs. (In re A.S.)*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*. Of course, given our decision reversing the termination of Father's parental rights, we express no opinion regarding whether the permanency plan will continue to be satisfactory following proper notice to Father and a decision on the merits of the petition to terminate his parental rights. However, as it relates to Mother's TPR case, the trial court did not clearly err in holding that DCS had a satisfactory plan for Children's permanent placement.

# Conclusion

[26] Because there was no proof of service upon Father, the trial court lacked personal jurisdiction over him. Therefore, the TPR order as to Father is void and hereby reversed. However, the trial court did not clearly err when it terminated Mother's parental rights to Children; therefore, that portion of the TPR order is affirmed.

Affirmed in part and reversed in part.

Najam, J., and May, J., concur.